RUCKER, J.,
dissenting.
At the age of seventeen Andrew Conley murdered his ten-year-old brother. I *881 agree with the majority that Dr. Daum’s testimony was properly admitted and I do not believe the trial court manifestly abused its discretion in weighing aggravating and mitigating circumstances in this case. However, I do not agree Conley should have been sentenced to die in prison. Therefore I respectfully dissent.
The United States Constitution prohibits “cruel and unusual punishment.” U.S. Const, amend. VIII. Such punishment is an excessive sanction violating the “basic ‘precept of justice that punishment for crime should be graduated and proportioned’ to both the offender and the offense.” Miller v. Alabama, — U.S.-, 132 S.Ct. 2455, 2458, 183 L.Ed.2d 407 (2012) (quoting Roper v. Simmons, 543 U.S. 551, 560, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005)). Whether a juvenile’s sentence of life without parole constitutes “cruel and unusual punishment” is an issue of national and international import as well as the subject of much scholarly literature. See generally, e.g., Miller, 132 S.Ct. 2455; Connie de la Vega & Michelle Leighton, Sentencing Our Children to Die in Prison: Global Law and Practice, 42 U.S.F.L. Rev. 983 (2008). To determine whether a punishment violates the Eighth Amendment, courts must look beyond historical conceptions to “the evolving standards of decency that mark the progress of a maturing society.” Graham v. Florida, — U.S.-, 130 S.Ct. 2011, 2021, 176 L.Ed.2d 825 (2010) (quoting Estelle v. Gamble, 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)).[9]
When examining a punishment for categorical compliance with the Eighth Amendment, the Supreme Court exercises its “own independent judgment whether the punishment in question violates the Constitution,” Graham, 130 S.Ct. at 2022, and considers “ ‘objective indicia of society’s standards, as expressed in legislative enactments and state practice’ to determine whether there is a national consensus against the sentencing practice at issue.” Id. (quoting Roper, 543 U.S. at 563-64, 125 S.Ct. 1183).
Employing this analysis, the Supreme Court has held death sentences for those under the age of eighteen violate the Eighth Amendment, Roper, 543 U.S. at 568, 125 S.Ct. 1183, and has held life without parole sentences for juveniles committing crimes other than homicide to be similarly offensive, Graham, 130 S.Ct. at 2030.[10] And the Supreme Court very re *882 cently held that sentencing schemes mandating life without parole for those under the age of 18 at the time of their crimes— including homicide crimes — violate the Eighth Amendment, because a juvenile has “ ‘lessened culpability and greater ‘capacity for change,’ ” and because precedent requires “individualized sentencing for defendants facing the most serious penalties.” Miller, 132 S.Ct. at 2460 (quoting Graham, 130 S.Ct. at 2026, 2030).[11] Based on the reasoning advanced in these cases, Conley argues that any sentence of life without parole for all juvenile offenders is unconstitutional, even for those who commit homicide.
The Supreme Court has found even where a majority of jurisdictions may statutorily permit a particular sentence, “an examination of actual sentencing practices” may “disclose[ ] a consensus against its use.” Graham, 130 S.Ct. at 2023. In Miller, the Supreme Court identified Indiana as one of fifteen states permitting discretionary life without parole sentences for juveniles. And as the Miller Court noted, in jurisdictions where juvenile life without parole sentences are discretionary, such sentences are unusual. Miller, 132 S.Ct. at 2471 n. 10. (“[W]hen given the choice, sentencers impose life without parole on children relatively rarely.”). Of the 421 juveniles serving life without parole sentences in these states, 348 — 83%— were confined in only four states: Arizona, California, Mississippi, and Oklahoma. See Nat’l Conference of State Legislatures, Juvenile Life Without Parole (JLWOP) (2010), http://www.ncsl.org/ documents/cj/jlwopehart.pdf (table of U.S. jurisdictions listing juvenile life without parole sentences by jurisdiction and noting in which jurisdictions life without parole sentences are entirely discretionary). According to Federal Bureau of Investigation statistics, juveniles committed 45,429 murders between 1980 and 2009. See C. Puzzanchera & W. Kang, Easy Access to the FBPs Supplementary Homicide Reports: 1980-2009 (2010), http://ojjdp.gov/ ojstatbb/ezashr/ (national homicide database permitting selection of results by age of offender and year of incident). As of February 2010, 2,465 U.S. juveniles were serving life without parole for homicide offenses. See Nat’l Conference of State Legislatures, supra. These numbers, while not providing an exact comparison, tend to confirm that as a matter of overall proportion to the opportunities for its imposition, life without parole sentences for juveniles convicted of homicide crimes is quite infrequent — occurring in less than 6% of juvenile homicide prosecutions. Accord Graham, 130 S.Ct. at 2024-25 (analyzing statistics of juvenile life without parole sentences for non-homicide crimes and concluding that “in proportion to the opportunities for its imposition, life without parole sentences for juveniles convicted of nonhomicide crimes is as rare as other sentencing practices found to be cruel and unusual”).
In cases holding certain punishments categorically unconstitutional as to juveniles, the Supreme Court has found confirmation for its judgment on these matters by reviewing accepted practice in the international community. Roper, 543 U.S. at 575, 125 S.Ct. 1183. For many years the Court “has referred to the laws of other countries and to international au *883 thorities as instructive for its interpretation of the Eighth Amendment’s prohibition of ‘cruel and unusual punishments.’ ” Id. And as it relates to juvenile life without parole sentences — even for homicide crimes — “[t]he United States is the only-country in the world that does not comply with the norm against imposing life without possibility of parole sentences on offenders who are under the age of 18 at the time of the offense.” Brief for Amnesty International, et al. as Amici Curiae Supporting Petitioners, Miller v. Alabama, 132 S.Ct. 2455 and Jackson v. Hobbs, No. 10-9647, 2012 WL 174238, at *2. According to an article cited by the Supreme Court in Graham, 130 S.Ct. at 2033, “Most governments have either never allowed, expressly prohibited, or will not practice [life without parole] sentencing on child offenders because it violates the principles of child development and protection established through national standards and international human rights law.” de la Vega & Leighton, supra, at 989. In fact, “[t]here are now at least 135 countries that have expressly rejected the sentence via their domestic legal commitments, and 185 countries that have done so in the U.N. General Assembly.” Id.
Further, it is notable that exposure of juveniles to life without parole sentences is frequently the result of the increased prevalence of statutes permitting or mandating transfer of juveniles into adult court. See id. at 991-92. As the Supreme Court has recognized, “transfer laws show ‘that the States consider 15-year-olds to be old enough to be tried in criminal court for serious crimes (or too old to be dealt with effectively in juvenile court), but tell[] us nothing about the judgment these States have made regarding the appropriate punishment for such youthful offenders’” Graham, 130 S.Ct. at 2025 (quoting Thompson v. Oklahoma, 487 U.S. 815, 826 n. 24, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988)) (plurality opinion) (emphasis in original). See also Miller, 132 S.Ct. at 2472-73. In Conley’s case, he was exposed to a life without parole sentence by virtue of Indiana Code section 31-30-1-4(a)(2) which provides: “The juvenile court does not have jurisdiction over an individual [at least 16 years of age] for an alleged violation of ... IC 35-42-1-1 (murder).”
But the key in the Supreme Court’s Eighth Amendment analysis in juvenile cases is its “judicial exercise of independent judgment” which “requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question” together with a determination of whether the sentence at issue serves legitimate penological goals. Graham, 130 S.Ct. at 2026. With respect to juvenile offenders, these inquiries are underpinned by the Supreme Court’s repeated recognition that juveniles are less culpable than adults and therefore are less deserving of the most severe punishments. See Id.
The presumption that juveniles are generally less culpable than adults is based on extensive past and ongoing “ ‘developments in psychology and brain science [which] continue to show fundamental differences between juvenile and adult minds’” — for example, in “‘parts of the brain involved in behavior control.’ ” Miller, 132 S.Ct. at 2464 (quoting Graham, 130 S.Ct. at 2026). As the Supreme Court has observed, there are “three significant gaps between juveniles and adults.” Id. at 2464. First, “[a]s compared to adults, juveniles have a ‘lack of maturity and an underdeveloped sense of responsibility.’ ” Graham, 130 S.Ct. at 2026 (quoting Roper, 543 U.S. at 569, 125 S.Ct. 1183). Second, “they ‘are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure,’ ” id. (quot *884 ing Roper, 543 U.S. at 569, 125 S.Ct. 1183), and “they have limited ‘control over their own environment’ and lack the ability to extricate themselves from horrific, crime-producing settings.” Miller, 132 S.Ct. at 2464 (quoting Roper, 543 U.S. at 569, 125 S.Ct. 1183). Finally, “a child’s character is not as ‘well formed’ as an adult’s ... and his actions [are] less likely to be ‘evidence of irretrievable depravity.’” Id. (quoting Roper, 543 U.S. at 570, 125 S.Ct. 1183). “These salient characteristics mean ‘it is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.’ ” Graham, 130 S.Ct. at 2026 (quoting Roper, 543 U.S. at 573, 125 S.Ct. 1183). Even justices not finding categorical Eighth Amendment violations in these juvenile cases agree with this precept. See Graham, 130 S.Ct. at 2039 (Roberts, C.J., concurring in the judgment) (“Roper’s conclusion that juveniles are typically less culpable than adults has pertinence beyond capital cases.”); Roper, 543 U.S. at 599, 125 S.Ct. 1183 (O’Connor, J., dissenting) (“It is beyond cavil that juveniles as a class are generally less mature, less responsible, and less fully formed than adults, and that these differences bear on juveniles’ comparative moral culpability.”).
Using this backdrop, the Supreme Court has recognized that “life without parole is the ‘second most severe penalty permitted by law,’ ” Graham, 130 S.Ct. at 2027 (quoting Harmelin v. Michigan, 501 U.S. 957, 1001, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring in part and concurring in the judgment)), and “the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes.” Miller, 132 S.Ct. at 2465. The Miller opinion highlighted how the goals of retribution, deterrence, incapacitation, and rehabilitation are not served by sentencing juveniles to life without parole. See id. at 2465 (noting that retribution makes less sense the less culpable the offender; deterrence against juveniles has limited effect as the attributes of youth “make them less likely to consider potential punishment”; incapacitation of a juvenile is only justified where the juvenile is incorrigible, and “ ‘incorrigibility is inconsistent with youth’ ”; the sentence of life without parole “ ‘forswears altogether the rehabilitative ideal’ ” (quoting Graham, 130 S.Ct. at 2029-30)). As the Court aptly put it in assessing life without parole for juvenile non-homicide crimes: “[T]his sentence ‘means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and the spirit of the [juvenile] convict, he will remain in prison for the rest of his days.’ ” Graham, 130 S.Ct. at 2027 (quoting Naovarath v. State, 105 Nev. 525, 779 P.2d 944, 944 (1989)).
The Miller Court limited its holding of unconstitutionality to mandatory juvenile life without parole sentences, stating, “[b]ecause that holding is sufficient to decide these cases, we do not consider Jackson’s and Miller’s alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger.” Miller, 132 S.Ct. at 2469. The thrust behind the Miller holding is that juvenile sentencing decisions must be individualized because, given the diminished culpability of juvenile offenders, there is a greater risk that a life without parole sentence will violate the Eighth Amendment. A sentencing court therefore must consider youth and its attendant characteristics — “and how those differences counsel *885 against irrevocably sentencing [children] to a lifetime in prison.” Id.
Conley was not sentenced under a mandatory scheme like those held unconstitutional in Miller. But the Miller decision does not preclude a conclusion that Conley’s sentence is unconstitutional. It is the consideration of those very things that a mandatory scheme prohibits — such as the juvenile defendant’s abuse by his stepfather, his regular use of drugs and alcohol, and his four suicide attempts, see id., at 2459-60 — that may lead to a conclusion that a particular sentence, when applied to a particular youth, violates the Eighth Amendment. As the Court stated:
Most fundamentally, Graham insists that youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole. In the circumstances there, juvenile status precluded a life without parole sentence, even though an adult could receive it for a similar crime. And in other contexts as well, the characteristics of youth, and the way they weaken rationales for punishment, can render a life-without-parole sentence disproportionate. “An offender’s age,” we made clear in Graham, “is relevant to the Eighth Amendment,” and so “criminal procedure laws that fail to take defendants’ youthfulness into account at all would be flawed.” The Chief Justice, concurring in the judgment, made a similar point. Although rejecting a categorical bar on life-without-parole sentences for juveniles, he acknowledged “Roper’s conclusion that juveniles are typically less culpable than adults,” and accordingly wrote that “an offender’s juvenile status can play a central role” in considering a sentence’s proportionality.
Miller, 132 S.Ct. at 2465-66 (quoting Graham, 130 S.Ct. at 2031, 130 S.Ct. at 2039 (Roberts, C.J., concurring in the judgment)).
In his concurrence in Graham, the Chief Justice applied a “narrow proportionality” review to determine if a life without parole sentence as to Graham in particular violated the Eighth Amendment. The Chief Justice recognized the purpose of such a review is not to “second-guess” the decisions of legislatures or trial courts, as “the Eighth Amendment does not require strict proportionality between the crime and the sentence.” Graham, 130 S.Ct. at 2037 (Roberts, C.J., concurring in the judgment) (quoting Ewing v. California, 538 U.S. 11, 23, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003)). Rather, it “forbids only extreme sentences that are grossly disproportionate to the crime.” Id. (quoting Ewing, 538 U.S. at 23, 123 S.Ct. 1179). Still, the Chief Justice concluded that based on the juvenile defendant’s lack of prior criminal convictions,[12] the “difficult circumstances of his upbringing” (which included his parents’ drug addiction in his early years, his diagnosis with attention deficit hyperactivity disorder, and his use at a young age of alcohol, tobacco, and marijuana) and his youth (sixteen at the time of the crime), the sentence of life without parole was likely a grossly disproportionate punishment for his crime of first-degree felony armed burglary with assault or battery. Id. at 2040 (Roberts, C. J., concurring in the judgment). Chief Justice Roberts therefore concurred in the Court’s judgment that Graham’s sentence was un *886 constitutional. Id. at 2042 (Roberts, C.J., concurring in the judgment).
As the majority here correctly recognizes, Roper,; Graham, and Miller are certainly distinguishable from this case. And though Miller's holding does not apply here, its admonition does: “[Gjiven all we have said in Roper, Graham, and this decision about children’s diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.” Miller, 132 S.Ct. at 2469 (emphasis added). Ultimately I would find it unnecessary to decide this case on Constitutional grounds and would instead exercise this Court’s review and revise authority under Appellate Rule 7(B) to reduce Conley’s sentence to a term of years.
I agree that the trial court did not manifestly abuse its sentencing discretion in this case.[13] Nonetheless, “[although a trial court may have acted within its lawful discretion in determining a sentence, Article VII, Sections 4 and 6 of the Indiana constitution ‘authorize^ independent appellate review and revision of a sentence imposed by the trial court.’ ” Anglemyer v. State, 868 N.E.2d 482, 491 (Ind.2007) (quoting Childress v. State, 848 N.E.2d 1073, 1080 (Ind.2006)). This authority is implemented through Indiana Appellate Rule 7(B), which allows a court on appeal to “revise a sentence authorized by statute if, after due consideration of the trial court’s decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender.” Though we have long recognized that the maximum sentence permitted by law should be reserved for the very worst offenders, Bacher v. State, 686 N.E.2d 791, 802 (Ind.1997), the purpose of appellate review of sentences is “not to achieve a perceived ‘correct’ result in each case,” but rather to “leaven the outliers.” Cardwell v. State, 895 N.E.2d 1219, 1225 (Ind.2008).[14] Appellate courts are not limited to the statutory mitigators and aggra-vators when considering a Rule 7(B) claim, but may look to other evidence in the record. See Roney v. State, 872 N.E.2d 192, 206 (Ind.Ct.App.2007), trans. denied.
As to the nature of the offense, there is no question this was a brutal crime. Conley strangled his younger brother, asphyxiated him by covering his head with a plastic bag, placed him in the trunk of his car, then went to see his girlfriend. But this is not the entire inquiry under Rule 7(B).
When considering Conley’s character, the majority focuses on Conley’s behavior during the crime and the next day. I would note in this regard that on the day after the murder — before anyone but two of his best friends knew of what happened — Conley drove himself to the police *887 station where he told police he killed his brother. He waived his Constitutional rights[15] and cooperated with police. Conley is very clearly distraught by what he did and cannot understand why he did it. Tr. at 617-18, 704. He even asked the psychologists assessing him after his arrest to help him get the death penalty for his crime. Tr. at 617, 704.
Conley’s upbringing was punctuated by his mother’s four marriages and the consequent changes in her living arrangements. See Depo. of Bridget Conley at 59-67.[16] Conley’s interviews with psychologists after the crime indicated he had attempted suicide at least five times. Tr. at 521, 790. There was evidence of neglect by his mother, Tr. at 834-35, and that one of his stepfathers had anally raped him at age seven or eight. Tr. at 622.[17] Even so, prior to committing this crime Conley had no convictions or juvenile adjudications of any kind. He was by all accounts a model student and had a “great” relationship with his mother and brother. See Tr. at 821 (testimony of Conley’s high school principal); Depo. of Bridget Conley at 6. See also Tr. at 861 (testimony of Marsha Louden noting that the brothers seemed to have a “good relationship” and that Conley consistently made “sure Conner’s needs were met”); Tr. at 845 (testimony of Conley’s maternal grandmother that “He’s always been a good boy,” and “He’s my best grandchild”). According to Conley’s mother, he received As and Bs “without even trying” but she knew he had the ability to get all As if he applied himself. Depo. of Bridget Conley at 7. See also Tr. at 678, 827 (testimony of long-time teachers of Conley’s). He had aspirations of going to college, and his best friend’s mother had taken him to make campus visits before beginning his senior year of high school. Tr. at 858-59; Appellant’s App. at 535.
Then, abruptly about two weeks before killing his brother, Conley revealed to his mother that he wanted to kill himself and had tried to electrocute himself in the family bathtub. Depo. of Bridget Conley at 8, 13. He showed his mother that he had also cut himself all over his chest, arms, stomach and legs. See Depo. of Bridget Conley at 12. See also Tr. at 790 (testimony of Dr. Parker describing Conley’s “cutting behavior” and multiple “serious attempts” at suicide). He then told his *888 mother — out of the blue — that he wanted to quit high school, get his GED, and join the National Guard. Depo. of Bridget Conley at 14. Conley’s mother interpreted his self-destructive behavior as manipulation to get her to agree to let him quit school. Depo. of Bridget Conley at 16. But Conley’s mother stated she “didn’t mind” that he wanted to quit school during his senior year, and the next day she took him to withdraw from school, giving her written consent for him to do so. Depo. of Bridget Conley at 14, 19; Appellant’s App. at 529. Conley’s mother also started searching for a therapist for him. Conley’s mother stated that had she any knowledge that he would be a danger to others, she would have “had him committed right away.” Depo. of Bridget Conley at 51. But when Conley later expressed interest in returning to school, his mother told him that if he went back to school, the school counselor would commit him to the psychiatric ward. Tr. at 857 (testimony of Marsha Louden).
As the trial court noted in its sentencing order, “All [diagnosing medical experts] agree that the Defendant suffered from a mental disease at the time of the murder.” Tr. at 1026. Their specific diagnoses varied, but included significant similarities. See, e.g., Tr. at 606 (Dr. Connor’s diagnosis of schizoaffective disorder bipolar type); Tr. at 780-81 (Dr. Parker’s diagnosis of depression with psychotic features, with possible bipolar disorder); Tr. at 524 (Dr. Olive’s diagnosis of major depressive disorder with symptoms of mixed personality disorder). And Dr. Connor opined that Conley had suffered from mental illness since his pre-adolescent years. Specifically, he found that Conley had an “ongoing and untreated ... mental health condition” from which he had suffered since approximately age eleven or twelve. Tr. at 615. Dr. Connor further testified that Conley’s mental illness affected his “ability to control [his actions] as compared to ... a person who has no mental health diagnosis.” Tr. at 616. Conley’s youth, combined with his mental illness, made him even less culpable than the average juvenile. Cf. Graham, 130 S.Ct. at 2027 (relying in part on the “twice diminished moral culpability” of a juvenile who did not intend to kill as compared to an adult murderer in finding life without parole categorically unconstitutional for juveniles convicted of non-homicide crimes).
This Court has recognized that even though evidence of a difficult childhood may not always warrant mitigating weight, “[i]t is of course true that ‘evidence about the defendant’s background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.’ ” Ritchie v. State, 875 N.E.2d 706, 725 (Ind.2007) (quoting Penry v. Lynaugh, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)).[18] And we have previously considered a defendant’s mental illness in deciding to reduce a sentence. See, e.g., Reid v. State, 876 N.E.2d 1114, 1117 (Ind.2007) (citing twenty-two-year-old defendant’s “history of mental health problems” in reducing his fifty year sentence for conspiracy to commit murder to the advisory sentence of thirty years); Walton v. State, 650 N.E.2d 1134, 1137 (Ind.1995) (reducing by half the sentence of a high school junior with diverging mental illness diagnoses for the brutal murders of his adoptive parents). Cf. Carter v. State, 711 N.E.2d 835, 843 (Ind.1999) (reducing the murder sentence of a juvenile with a be *889 havioral disorder and some childhood abuse from sixty to fifty years under the precursor to Rule 7(B)).
Finally, Conley was only seventeen at the time of this crime, and I find, as has the Supreme Court, that his age is relevant to the assessment of his character. There is no question that juveniles have developmental issues that reduce their culpability for crimes. In this case, it seems clear that Conley “was still a teenager with a developing brain and impulse control issues made worse by his mental illness.” Amended Br. of Appellant at 28.
I disagree with the majority’s characterization of Conley’s “hardened character.” Op. at 877. While many juveniles may commit crimes that “reflect[ ] unfortunate yet transient immaturity,” only “the rare juvenile” is capable of committing a crime that “reflects irreparable corruption.” See Roper, 543 U.S. at 573, 125 S.Ct. 1183. I cannot conclude at this time that Andrew Conley is one of those rare juveniles.[19] For this reason I would revise his sentence to the maximum term of sixty-five years.
SULLIVAN, J., concurs.

. Like the U.S. Constitution, the Indiana Constitution also prohibits cruel and unusual punishment. See Ind. Const, art. 1, § 16 ("Cruel and unusual punishments shall not be inflicted.”). Protections afforded under Indiana’s Constitution are not necessarily coextensive with those provided by the Federal Constitution, and our analysis of many Constitutional issues frequently does not follow in lockstep with the federal analysis. See, e.g., Litchfield v. State, 824 N.E.2d 356, 359 (Ind.2005) (applying different analysis for reasonableness of a police search); Collins v. Day, 644 N.E.2d 72, 75 (Ind.1994) (identifying independent analyses for Indiana Privileges and Immunities and Federal Equal Protection clauses). "Punishment is cruel and unusual under Article 1, Section 16 if it makes no measurable contribution to acceptable goals of punishment, but rather constitutes only purposeless and needless imposition of pain and suffering.” Dunlop v. State. 724 N.E.2d 592, 597 (Ind.2000) (internal quotations omitted). Further, ”[t]he penal code shall be founded on the principles of reformation, and not of vindictive justice.” Ind. Const, art. 1, § 18. This Court has held that life imprisonment without parole is not per se cruel and unusual punishment. Dunlop, 724 N.E.2d at 597. But prior to this case we have never considered specifically whether life imprisonment without parole may be unconstitutional as applied to juveniles.

. Roper concerned a seventeen-year-old sentenced to death for planning and executing a horrifying crime that included burglary, kidnapping, and murder. Roper, 543 U.S. at *882 556-57, 125 S.Ct. 1183. Graham involved a sixteen-year-old sentenced to life without parole for first-degree felony armed burglary with assault or battery. Graham, 130 S.Ct. at 2018.

. The defendants in Miller were fourteen-year-olds convicted of homicide. Both were sentenced to life without parole under two different mandatory state sentencing statutes.

. Although this was Graham’s first conviction, he had acknowledged committing “two or three” other robberies, and was at the time of this conviction also found guilty of a separate home invasion robbery and possessing a firearm. Graham, 130 S.Ct. at 2019. Further, Graham began drinking alcohol and using tobacco at age 9 and he smoked marijuana at age 13. Id. at 2018.

. The Supreme Court in Miller made a point of requiring a juvenile’s sentence "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." Miller, 132 S.Ct. at 2469 (emphasis added). It is not yet clear how this language might apply on appellate Eighth Amendment review of a particular juvenile’s sentence. Nevertheless, it seems clear to me that our “manifest abuse of discretion" standard for review of a trial court's weighing of aggravators and miti-gators is no substitute for an Eighth Amendment proportionality analysis.

. According to the U.S. Department of Justice, less than one quarter of state homicide convictions in the year 2006 resulted in life without parole sentences. See Seth Rosenmerkel, et al., U.S. Dep’t of Justice Bureau of Justice Statistics, Felony Sentences in State Courts, 2006 — Statistical Tables at 7 (Table 1.4) (2010), http://bjs.ojp.usdoj.gov/content/ pub/pdf/fssc06st.pdf. In fact, the median sentence in 2006 for homicide crimes — including those by adult offenders — was twenty-two years. See id. at 6 (Table 1.3).

. Because Conley was a minor, Conley’s mother (also the victim’s mother) was required to consent to this waiver, which she did. Tr. at 1022. She has not seen Conley since she became aware of the murder. See Depo. of Bridget Conley at 67.

. After the crime, Conley’s mother Bridget relocated outside of Indiana and was unavailable for trial. The parties agreed to conduct a deposition of Bridget Conley in lieu of her trial testimony. A video of the deposition was played on the record for the trial court at the sentencing hearing, and a copy of the transcript of the deposition was admitted as Exhibit 498A. See Tr. at 576-81; Depo. of Bridget Conley at 5. Because the actual recording was not transcribed directly into the record, I refer to the Deposition Transcript in lieu of the Sentencing Hearing Transcript.

.Conley's counsel found out about the rape because Conley had confided about it to a friend before these events. The friend informed Conley’s counsel, who informed Dr. Conner, the consulting psychiatrist. When later asked by Dr. Connor why he hadn't initially disclosed the molestation, Conley responded that ”[h]e felt like ... it was nasty, it was no one's business, it didn’t really have anything to do with [these events].” Tr. at 626. In fact, when Dr. Connor asked Conley whether the molestation could be connected to what Conley did to his brother, Conley replied “I don’t see how it could be. They are two very different things.” Tr. at 623. Dr. Connor found that these responses — and the fact that Conley had not initially tried to use the molestation to his advantage — made Conley’s descriptions of this and other events of his childhood "more credible” rather than less so. See Tr. at 623-24.

. And as noted above, the Rule 7(B) analysis is not limited to statutory mitigators.

. As the majority notes, we know the details of the crimes committed by two of the three other Indiana juveniles sentenced to life without parole. One stalked an unsuspecting college student and shot him in the head because "I'm hyped and I feel like killing somebody.” See op. at 880 n. 7. The other shot a police officer in the head after the officer observed him riding a potentially stolen bicycle. Id. at 880 n. 8.